**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 25, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

ERIC GUILLERMO GARCIA, a/k/a Eric
G. Garcia, a/k/a Eric Guillerm, a/k/a Eric
Gillerno,

    Defendant - Appellant.

No. 16-1011
(D.C. No. 1:14-CR-00315-RM-1)
(D. Colo.)

---

**ORDER AND JUDGMENT**[*]

---

Before **BRISCOE**, **SEYMOUR**, and **McHUGH**, Circuit Judges.

---

After examining the briefs and appellate record, this panel has determined

unanimously that oral argument would not materially assist in the determination of this

appeal. See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is, therefore,

submitted without oral argument.

Defendant Eric Garcia appeals from the sex offender special conditions of

---

[*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

supervised release that were imposed by the district court following its revocation of

Garcia's prior term of supervised release. Exercising jurisdiction pursuant to 28 U.S.C. §

1291, we affirm the district court's imposition of those conditions.

I

On December 17, 2004, Garcia pleaded guilty in Texas state court to attempted

sexual assault of a child, a third degree felony under Texas state law. That crime arose

out of Garcia's sexual misconduct with his then fourteen-year-old stepdaughter.

Specifically, Garcia first "got into bed with" his stepdaughter, prompting her to "le[ave]

the bedroom and . . . go to a different location." ROA, Vol. 3 at 214. Garcia "followed

[his stepdaughter] to this new location." Id. There, she fell asleep but later "awoke to

find him, penis in hand, rubbing it on her lips." Id. Garcia was sentenced in connection

with this crime to a ten year term of imprisonment "with 180 days shock probation."

Supp. ROA, Vol. 1 at 13.

On June 17, 2005, Garcia was released from state custody and ordered to serve

nine years and six months of probation. Shortly after his release from custody, Garcia

registered as a sex offender in accordance with Texas state law and acknowledged in

writing the requirements for complying with Texas state law regarding sex offender

registration. At the time of his initial registration, Garcia indicated that he was living at a

residence in Austin, Texas.

While on probation, Garcia "participated in offense-specific treatment in Texas."

ROA, Vol. 2 at 44. The precise nature and extent of that treatment is unclear from the

record.

On January 3, 2008, Texas state officials moved to revoke Garcia's probation "due to [his] failure to pay court ordered fees, and for committing a subsequent offense [(theft)]." Supp. ROA, Vol. 1 at 20. On March 21, 2008, Garcia's probation was revoked and he was sentenced to three years' imprisonment for the combination of the probation violation and the new offense of theft. Garcia served that time and was released from custody on March 9, 2011.

In May 2011, Garcia updated his address with the Austin Police Department. Approximately three months later, on September 1, 2011, an officer with the Austin Police Department's Sex Offender Apprehension and Registration Unit conducted a compliance check to verify Garcia's last-registered address. Garcia "was not at the residence and the officer obtained a written statement from the resident that Garcia no longer lived [there]." Id. at 14. This resulted in Garcia being indicted in Texas state court for failure to comply with registration requirements. That indictment remains pending.

Over a year later, on October 6, 2012, Garcia was arrested in Thornton, Colorado, and charged in Colorado state court with failure to register as a sex offender. After being released on bond, Garcia "was issued a five day notice to register." Id. Garcia "registered as a sex offender in Colorado on October 15, 2012." Id.

On November 20, 2012, a federal grand jury in the Western District of Texas indicted Garcia on one count of failure to register as a sex offender, in violation of 18 U.S.C. § 2250(a). Garcia was arrested on that charge on November 29, 2012. On

February 19, 2013, Garcia entered a plea of guilty, without benefit of a plea agreement, to the single count alleged in the indictment. He was sentenced to a term of imprisonment of twelve months, to be followed by five years of supervised release. Special conditions of supervised release were imposed, including Garcia's "participat[ion] in and successful[] complet[ion] [of] an approved program of sex offender evaluation and treatment," ROA, Vol. 2 at 10, limitations on Garcia's "use of computer and Internet access devices," id. at 11, installation of "software/hardware designed to monitor [his] computer activities," id., and a prohibition on Garcia "associat[ing] with any child or children under the age of 18 except in the presence and supervision of an adult specifically designated in writing by the probation officer." Id.

Garcia completed his term of imprisonment and began his term of supervised release in November 2013.[1] Garcia moved in and began residing with an aunt, uncle, and cousin in Denver. On December 19, 2013, Garcia "signed treatment contracts at RSA, Inc. (RSA), the Probation Office's contract treatment agency, for offense-specific treatment." Id. at 15.

In July 2014, Garcia "began living in an unapproved residence" in Denver. Id. "A modification for residential reentry center (RRC) placement was requested due to this violation and [Garcia] resided in a motel . . . from July 21, 2014, until bed space was available at the RRC." Id. "On August 28, 2014, [Garcia] began a 180 day RRC

---

[1] Jurisdiction over Garcia's supervised release was transferred from the Western District of Texas to the District of Colorado in July 2014. ROA, Vol. 2 at 12.

-4-

placement" in Denver.  Id.  The RRC was separate and distinct from RSA; the RRC was where Garcia resided, whereas RSA was his sex offender treatment provider.

On December 19, 2014, a supervised release violation warrant was issued charging Garcia with failure to participate in sex offender treatment as directed by his probation officer.[2]  The warrant alleged that Garcia had engaged in "[a]n ongoing pattern of manipulation and secret keeping, going to unapproved locations in the community, going to locations knowing minors were present and lacking progress in treatment."  ROA, Vol. 2 at 15.  It also alleged that Garcia "failed to answer truthfully to inquiries asked by [his probation] officer," and "instead provided [the] officer with misinformation."  Id.  In addition, it alleged that Garcia has been "recently assessed using a sexual dynamic risk indicator assessment," "scored high risk," and was believed by RSA to "belong[] to a group of men whose long term risk for sexual re-offending [wa]s high."  Id.

Garcia appeared before a magistrate judge on December 23, 2014.  Garcia's probation officer testified that, in his opinion, Garcia was not "amenable to any conditions of . . . release."  ROA, Vol. 3 at 22.  He explained: "At this time, we have an untreated sex offender that is unable to be honest and that engages in secret-keeping behavior, which, unfortunately, causes me to have an inability to deconstruct the secret lifestyle, which poses a risk to the community."  Id. at 22-23.  He also testified that the

_____

[2] On December 21, 2014, two days after the supervised release violation warrant was issued, RSA terminated Garcia as a resident for "failure to comply with the rules and restrictions of the treatment program and his lack of progress in the treatment program." ROA, Vol. 3 at 21.

-5-

RRC was unwilling to take Garcia back, and that Garcia was not eligible at that time for treatment with RSA and it was RSA's recommendation "that he should be placed in a secured setting." Id. at 23. The magistrate judge found there was "probable cause to find that a violation of law occurred," and thus "refer[red] the case to the district judge for further proceedings." Id. at 52.

Garcia subsequently appeared before the district court on February 18, 2015, and admitted to the alleged violation of supervised release, i.e., failure to participate in sex-offender treatment as directed by his probation officer. The district court sentenced Garcia to a five-month term of imprisonment (a sentence at the very bottom of the Guidelines range), to be followed by a five-year term of supervised release. The district court imposed several special conditions of supervised release, including (1) that he "participate in and successfully complete an approved program of sex-offender evaluation and treatment which may include polygraph, plethysmograph, [and] Abel examinations as directed by [his] probation officer," id. at 98, (2) that his "use of computers and Internet access devices . . . be limited to those" authorized by his probation officer, id., (3) that he "allow the probation officer to install software/hardware designed to monitor computer activities on any computer that he is authorized to use," id. at 100, (4) that he "shall not associate with any child or children under the age of 18, except in the presence and under the supervision of an adult specifically designated, in writing, by the probation officer, id., and (5) that he "reside in a residential reentry center for a period of up to 180 days, with early discharge, at the discretion of the probation officer." Id. at 101.

-6-

On October 7, 2015, Garcia's probation officer filed a petition for revocation of Garcia's supervised release. The petition alleged three violations: (1) failure to reside in and comply with the rules of the RRC; (2) failure to participate in sex-offender treatment and comply with the rules and restrictions specified by RSA; and (3) unauthorized association with children under the age of eighteen. A supervised release violation warrant was issued charging Garcia with failure to participate in sex offender treatment as directed by his probation officer.

The district court held a hearing on the petition on December 11, 2015. Garcia's probation officer testified at the hearing regarding the three alleged violations. With respect to the first violation, the officer testified that on October 6, 2015, he "received a reject letter" from the RRC "stating that [Garcia's] placement at the [RRC] was terminated due to noncompliance." Id. at 108. That letter, the officer testified, "talked about [Garcia] being unaccountable in another location in the community on at least eight separate occasions, having unapproved contact with minors on at least three separate occasions, [and] being discharged unsuccessfully from sex-offender treatment." Id. at 108-09. With respect to the second violation, the officer testified that Garcia was terminated from sex-offender treatment due to "[u]napproved contact with minors and [an] ongoing pattern of manipulation and secret-keeping and overall lack of progress." Id. at 111. Lastly, with respect to the third violation, the officer testified that "[f]rom on or about May 7, 2015, to September 2015, [Garcia] associated with multiple children under the age of 18," and "[o]n October 1[, 2015,] . . . admitted to the probation officer to

having ongoing association with children under the age of 18, without the presence and supervision of an adult, specifically, designated in writing by his probation officer." Id. at 112 (italics omitted). These contacts included "seeing his daughter . . . multiple times in the community," as well as "contact with a minor niece . . . who came to the halfway house" and "hugged [Garcia's] waist while he was there." Id. at 114. Garcia also testified and attempted to explain each of the three alleged violations. More specifically, he essentially conceded the violations but attempted to explain why they occurred. Garcia's ex-wife and a sister testified on his behalf.

After hearing all of the testimony, the district court found that Garcia committed each of the violations alleged in the petition for revocation. The district court also stated that it "d[id] not find [Garcia's] testimony to be credible," and that some of his testimony was "completely untrue." Id. at 211. Further, the district court expressly found that Garcia "pose[d] a danger to his children." Id. at 214. To be sure, the district court recognized "there's some distinction between biological and stepchildren," but it nevertheless noted that Garcia "sexually assaulted" his stepdaughter, who "was in his control" and "under his protection as a parent." Id. at 215. The district court also noted that, because "[t]here ha[d] been no extended period or break from . . . controls or supervision" over Garcia, it would not "feel comfortable saying that there [wa]s a history of non-risk involved here." Id. at 216.

The district court in turn sentenced Garcia to a term of imprisonment of eleven months, to be followed by a five-year term of supervised release. As part of the special

conditions of supervised release, the district court ordered Garcia: (1) to participate in and successfully complete sex offender evaluation and treatment; (2) to limit his use of Internet access devices to those authorized by the probation officer; (3) to allow the probation officer to install software or hardware designed to monitor his computer activities; (4) not to associate with any child or children under the age of eighteen, except in the presence of an adult specifically designated in writing by the probation officer; and (5) to reside in an RRC for a period of up to 180 days, with early discharge at the discretion of the probation officer. The district court explained its reasons for imposing these conditions:

> First, what we have is a circumstance where – unlike some of the other cases that have been before the Tenth Circuit, and I am specifically referring to *Burns* and *Bear*, there is conduct against your children, and while there is a difference, I grant you biological difference between a genetic child and one that is either adopted or a stepchild. The fact remains, if I recall the testimony from your ex-wife, that child was about 8 when you and she first got together, and it was at age 14 that these events occurred.

> These events being that she was, at 3 in the morning awakened by you in her bed, and at 6 in the morning awakened by your penis being rubbed against her mouth. I don't view this as, *Well, he is only a danger to people that aren't his biological children.* I don't know why I would make that leap. The fact of the matter is, this child was a member of your family, had been a member of your family for years, and the degree of familial betrayal extends not only to her, but to your wife, who, as I understand it, from reading the original presentence report, was pregnant with one of your children, and on bedrest, and that's how it came to be that you had an opportunity to be alone in the middle of the night with this 14-year-old girl. That type of conduct and those types of circumstances say, to me, that the line that may be appropriate in another case, and what I mean by that is, *Hey, it's not his children, don't be – don't treat them – lump them in with the risk to others.* I can't – I'm not going to draw that line. I think that there's actual conduct in this case that involves the familial betrayal on

multiple levels, and that that is very different than what is in other cases, and that is a compelling basis for me to impose matters that contain some restrictions on your association with children.

I think that there is a failure of opportunity. I mean, I'm told this was a long time ago, but as I did earlier today, I told you, and I don't think you would disagree with me, that about half of that period of time, from 2004 to now, was time where you were either in custody, in a halfway house, or somehow in a controlled environment. So this – the mere passage of time, while it may have been compelling, in the case of *Bear*, it is less compelling in your case, because you were controlled for about half of that time, and when you look at the circumstances of this case, if we are to say, *Well, what is it that he did?* This crime occurred in circumstances where you were alone. Where you were, at night, within a home or environment. It's not a circumstance, and this is to your credit, where there's some claim that you were wandering down the street exposing yourself to children or snatching children up. No. It was, there needed to be a circumstance where you could, if you would, make your move, and those circumstances haven't exactly been present during this span of time, between 2004 and now.

I also note that there is a lack of progress. This is the second time that you have been booted out of sex-offender treatment, and while you may say that some of this is due to the pressure of wanting to associate with your children, I know that neither the first time that you were revoked nor this time, has anything been based solely on the association with children, that has been one of a number of things that has caused you to get crosswise with RSA. Other things include, honesty. Other things include being unaccountable for periods of time and in places where you are not supposed to be. And so, unlike other cases, we also have a period of repeated failures to comply, that is balanced[.] * * *

I note that one reading of *Bear* is that there needs to be some – that there needs to be some kind of an assessment of risk that's present before the Court can make such a statement or impose such a condition, and while I don't read *Bear* as imposing that right a requirement in each case, and I believe that there are compelling reasons to be concerned with your – with your association with children, whether they be your own or others, I do note that even under the material provided to me by counsel, there is, at least, a moderate risk of reoffending that is – that has been presented to me. And I note that that moderate risk is not in any way confined to boy, girl, biological, nonbiological. And finally, the last think that I would say is this,

-10-

and it is minor, but I nonetheless note it, consistently, as a wave throughout all of this, what we have is a circumstance where there has been questioning of your honesty and openness. You, even on the stand, testified that when you encountered [your daughter] Danielle, you didn't tell people for a period of time, and when one is dealing with sex offenses with children, one would have to be a little bit naive not to recognize that manipulation is a tool that is frequently used to manipulate children into postures where things happen.

Now, I grant you, in your prior case, it did not involve, from what I can see, any degree of manipulation. Simply involved just rank sticking it in her face, but putting that to the side, that does not mean that manipulation is not something that does not raise flags when one is dealing with the question of abuse, particularly sexual abuse of children.

And so for all of these reasons, I find and conclude that there are compelling reasons, both to reimpose conditions of supervision that require sex-offender treatment and to reimpose those conditions, as I did previously, which includes the potential for some degree of limitation on the right to association with children. I say it that way because nothing in the conditions that have – that were prepared last time or this time says, *You shall not*. In fact, it says, *You shall get sex-offender treatment*, and, in fact, there are mechanisms through which you can be permitted to have contact with your children. There are – there is a provision in the conditions that were imposed last time, and will be imposed this time, that the probation officer has some ability to grant permission to have contact with children, but I am not going to just simply take it off the table, and then wait and see if I need to reimpose it, through some modification or something that happens in the future. When we are dealing with children, the risk is too great, the harm is too great and it works the other way around.

Id. at 244-249 (italics in original).

Garcia now appeals.

II

Before addressing the issues raised by Garcia on appeal, we must first address the

government's motion to dismiss Garcia's appeal as untimely under Federal Rule of

Appellate Procedure 4(b)(1)(A). That rule provides that "[i]n a criminal case, a defendant's notice of appeal must be filed in the district court within 14 days after the later of: (i) the entry of either the judgment or the order being appealed; or (ii) the filing of the government's notice of appeal." Fed. R. App. P. 4(b)(1)(A).

The district court in this case entered final judgment on December 17, 2015. Ten days later, on December 27, 2015, Garcia's counsel moved to withdraw, asserting that "Garcia requested that [she] withdraw so that he could pursue a pro se appeal." Dist. Ct. Docket No. 49 at 1. On January 12, 2016, Garcia filed a pro se notice of appeal.

On January 13, 2016, we issued an order abating the deadline to file preliminary documents pending further order of the court. Less than a month later, on February 5, 2016, we issued an order appointing counsel to represent Garcia and setting the deadlines for the filing of pleadings.

The government moved to dismiss the appeal as untimely on February 11, 2016. On February 18, 2016, Garcia's appointed counsel filed a response to the motion to dismiss. In that response, Garcia's counsel noted that he had spoken by phone with Garcia and that "Garcia stated that he initially mailed his Notice of Appeal the week after his December 11, 2015 revocation hearing." Response at 2. Garcia's counsel argued that Garcia, based upon his statement, "initially compl[ied] with the 'mailbox rule' set forth in Fed. R. App. P. 4, but that his first mailing was lost at FDC-Englewood or in the mail." Id.

On February 24, 2016, the clerk of this court issued an order directing Garcia to

-12-

"file documentation showing that he complied with the prisoner mailbox rule when he mailed his first notice of appeal." Order at 1. Garcia complied with the clerk's order by filing a sworn declaration on March 16, 2016.

On April 8, 2016, we issued an order taking the government's motion to dismiss under advisement and partially remanding the case to the district court to permit Garcia, upon proper motion, an opportunity to demonstrate that his failure to comply with the filing requirements of Federal Rule of Appellate Procedure 4(b)(1)(A)(i) was based on excusable neglect or good cause. On April 14, 2016, Garcia filed with the district court a motion for extension of time to file his notice of appeal. After allowing the government to respond, the district court held a hearing on Garcia's motion on April 28, 2016. At the conclusion of the hearing, the district court granted Garcia's motion for extension of time to file his notice of appeal.

In light of the district court's order granting Garcia's motion, we conclude that Garcia's notice of appeal is timely and the government's motion to dismiss should be denied.

### III

Garcia asserts two issues on appeal. First, he argues that the district court abused its discretion by imposing the special sex offender conditions as part of the terms of his supervised release. Second, he argues that the district court committed plain error by unconstitutionally delegating sentencing authority to RSA, the entity designated to provide Garcia with sex-offender treatment. We conclude, as discussed in greater detail

below, that both of these arguments lack merit.

*The special sex offender conditions of supervised release*

In his first issue on appeal, Garcia argues that the facts of his case do not justify the special sex offender conditions of supervised release that were imposed by the district court. In support, Garcia notes that his original sex offense was "based on a single incident" that occurred "twelve years prior to his [current] sentencing." Aplt. Br. at 8. He further notes that he "completed treatment as part of" the sentence for that original offense, "and never exhibited any propensity to reoffend." Id. He also argues that "the condition allowing RSA to impose severe restrictions on [his] movements and associations is not reasonable in light of [his] history." Id. at 9. Lastly, he argues that "the condition prohibiting [him] from unsupervised contact with his own children is an unwarranted infringement on his fundamental right of familial association." Id.

"We review for abuse of discretion a special condition of supervised release to which timely objection was made."[3] United States v. Martinez-Torres, 795 F.3d 1233, 1236 (10th Cir. 2015). Under this standard of review, we will reverse only if the district court's imposition of the challenged special condition of supervised release "'was based on a clearly erroneous finding of fact or an erroneous conclusion of law or manifests a

[3] The government disputes whether Garcia timely objected in the district court to the imposition of all the sex offender special conditions. Aplee. Br. at 16. A review of the revocation hearing transcript indicates that Garcia clearly objected to the fact that he would not be "able to see his children and participate in their lives." ROA, Vol. 3 at 233. His counsel's statements could also conceivably be construed as a general objection to the requirement of sex offender treatment with RSA. Consequently, and out of an abundance of caution, we will assume that Garcia timely objected.

-14-

clear error of judgment.'" Id. (quoting United States v. Bear, 769 F.3d 1221, 1226 (10th

Cir. 2014) (internal quotation marks omitted)).

"District courts have broad discretion to impose special conditions of supervised

release." Bear, 769 F.3d at 1226. "The limits of that discretion are prescribed by 18

U.S.C. § 3583(d)." Id. Section 3583(d) requires that special conditions of supervised

release:

> (1) be reasonably related to the nature and circumstances of the offense, the
> defendant's history and characteristics, the deterrence of criminal conduct,
> the protection of the public from further crimes of the defendant, or the
> defendant's educational, vocational, medical, or other correctional needs;
> (2) involve no greater deprivation of liberty than is reasonably necessary to
> achieve the purpose of deterring criminal activity, protecting the public, and
> promoting the defendant's rehabilitation; and (3) be consistent with any
> pertinent policy statements issued by the Sentencing Commission.

Id. "Sex offender conditions of supervised release may be imposed, even at sentencing

for crimes which are not sex crimes, if supported by § 3583(d)." Id.

> In Bear, we noted that

> [p]rior sex offenses can be too temporally remote for sex-offender
> conditions of supervised release to be reasonably related to the nature and
> circumstances of the offense, the defendant's history and characteristics, the
> deterrence of criminal conduct, the protection of the public from further
> crimes of the defendant, or the defendant's educational, vocational,
> medical, or other correctional needs.

Id. at 1227. We emphasized that "[t]here is no bright-line rule for the outer limit of

temporal remoteness, in part because district courts must consider more than just the age

of a defendant's prior conviction." Id. In particular, we noted, a district court must

consider, "[i]n addition to the time that has passed since the prior conviction, . . . whether

-15-

the special conditions are 'reasonably related' to the Statutory Sentencing Factors in 18 U.S.C. § 3553(a)." Id.

In United States v. Dougan, 684 F.3d 1030 (10th Cir. 2012), we also "identified two other factors relevant to the consideration of whether old offenses could support the imposition of sex offender conditions of supervised release." Bear, 769 F.3d at 1228 (discussing Dougan). First, we suggested that an interim conviction for failure to register as a sex offender could, even despite the age of a past sex offense, render the reasonableness of sex offender special conditions of supervised release "a much closer question." Dougan, 684 F.3d at 1037. Second, we suggested that the defendant's background could prove relevant, such as if the defendant had "an extensive history of committing sex crimes" or "a history of sexual offenses involving minors." Id. at 1035-36.

Turning to the facts of Garcia's case, it is undisputed that his criminal history includes only one sex offense: a 2004 Texas state conviction for attempted sexual assault of a child that arose out of his sexual misconduct with his then fourteen-year-old stepdaughter. It also appears to be undisputed that Garcia, while serving probation in connection with that conviction, successfully completed some type of sex offender treatment. That said, however, it is unclear from the record what the precise nature and length of that treatment was. Likewise, there is nothing in the record indicating who the provider of the treatment was or what their ultimate assessment of Garcia was.

If these were the only relevant facts, Garcia's challenge might have merit. But, as

the district court expressly noted at the time of sentencing, there are other factors at play here.  Since mid-2011, Garcia has displayed a troubling habit of both failing properly to maintain his sex offender registration and failing to comply with special sex offender conditions of supervised release.  Garcia's registration issues began in 2011 when he failed to update his address with the Austin Police Department.  Garcia then abruptly left the State of Texas and moved to Colorado, but failed to register as a sex offender with Colorado state authorities.  Only after being arrested by Colorado state authorities in late 2012 and charged under Colorado state law did Garcia actually register as a sex offender in Colorado.

Garcia's case caught the attention of federal prosecutors in Texas, and Garcia was ultimately convicted of failure to register as a sex offender.  Garcia was sentenced in connection with that conviction to a one-year term of imprisonment and a five-year term of supervised release.  Notably, that term of supervised release included sex offender special conditions, including Garcia's participation in and successful completion of sex offender evaluation and treatment, as well as a prohibition on Garcia associating with children under the age of eighteen without proper supervision.

All of which led to Garcia's pattern of failing to comply with sex offender special conditions of supervised release.  During two separate periods of supervised release—the first in 2014 and the second in 2015—Garcia failed to participate as required in mandated sex offender treatment.  More specifically, on both occasions he engaged in a series of secret behavior, including going to unapproved locations and withholding information

-17-

from his providers and probation officer. He also, in 2015, had unapproved contact with minors.

At least four other factors are also relevant to our analysis. First, as the district court noted in sentencing Garcia, his repeated periods of imprisonment and supervised release between the time of his original sex offense conviction in 2004 and his most recent conviction in 2015 have undoubtedly limited his exposure to children. Thus, the length of time between his original offense and the current offense—approximately eleven years—may not accurately represent the likelihood of him reoffending without additional sex offender treatment.[4] Second, at the time Garcia was terminated from the sex offender treatment program in December 2014, the treatment provider (RSA) concluded, based upon "risk assessments and clinical opinion," that "Garcia appear[ed] to be within the **High** range of risk for sexual re-offending." ROA, Vol. 2 at 23 (emphasis in original). Garcia disputed this risk determination at the time of his revocation proceeding, but the district court expressly found, after reviewing all of the evidence provided to it by the parties, that there was, "at least, a moderate risk of [Garcia] reoffending." ROA, Vol. 3 at 248. Third, and relatedly, the district court found that this

---

[4] In Dougan, this court acknowledged that it is possible for a defendant to commit sex offenses while incarcerated. 684 F.3d at 1036. Nevertheless, the court was "hesitant to agree that a defendant's sex-offense-free record in prison is as probative of his proclivities as a similarly blemish-free period of time while at liberty." Id. Thus, while it refused to "discount . . . entirely" the defendant's "periods of incarceration since his 1994 [sex offense] conviction," it also refused to treat those periods "the same as his periods out of prison." Id. Thus, contrary to Garcia's assertion, Dougan supports rather than undermines the district court's reasoning. See Aplt. Br. at 27 (discussing Dougan).

"moderate risk [of reoffending] [wa]s not in any way confined to boy, girl, biological, nonbiological." Id. In other words, the district court found that Garcia posed at least a moderate risk to his own children. Fourth, the district court also expressly found, after hearing Garcia's testimony and directly questioning him, that Garcia was less than truthful, including regarding the nature of his contacts with children during his term of supervised release.

Considering all of these factors together, we conclude that the sex offender special conditions of supervised release imposed by the district court are reasonably related to the nature and circumstances of the offense, Garcia's history and characteristics, the deterrence of criminal conduct, and the protection of the public from further crimes of Garcia.

Garcia also argues that "the condition allowing RSA to impose severe restrictions on [his] movements and associations is not reasonable in light of [his] history." Aplt. Br. at 9. That argument is plainly refuted by the facts we have outlined above. In particular, given Garcia's repeated history of engaging in secret behavior while undergoing sex offender treatment, the district court was well justified in authorizing RSA to restrict Garcia's movements and associations. Although Garcia attempts to downplay this history by asserting that none of it involved "inappropriate behavior," Aplt. Br. at 21, the fact remains that he has repeatedly engaged in unauthorized and secretive behavior, all of which undermined his ability to complete successfully the mandated sex offender treatment.

Garcia's final argument is that "the condition prohibiting [him] from unsupervised contact with his own children" amounts to "an unwarranted infringement on his fundamental right of familial association." Id. at 9. We disagree. As the district court noted when it sentenced Garcia, Garcia's prior sex offense involved a minor member of his own family, specifically his then fourteen-year-old stepdaughter who had lived with Garcia for approximately six years. To be sure, the district court acknowledged that there is a "biological difference between a genetic child and one that is either adopted or a stepchild." ROA, Vol. 3 at 244. But it expressly rejected the notion that Garcia represented "only a danger to people that aren't his biological children." Id. at 245 (italics omitted). In doing so, the district court concluded that Garcia's sex offense "involve[d] . . . familial betrayal on multiple levels." Id. Notably, Garcia does not seriously dispute these conclusions. Thus, we conclude that there was a valid factual basis for the district court to place restrictions on Garcia's right to associate with his own children. See United States v. Burns, 775 F.3d 1221, 1224 (10th Cir. 2014) (holding that a condition limiting a defendant's contact with his own children is valid only if the defendant is found to present a danger to his children)

It is also worth noting that Garcia's case is factually distinguishable from Bear, which he attempts to rely on. The defendant in Bear was the father of three young children whom he lived with and presumably intended to return to upon his release from confinement. Garcia, in contrast, has not lived with his children for years and there is no indication that he intends to do so in the foreseeable future. Moreover, Garcia's counsel

-20-

stated at the revocation hearing that "by the time" Garcia completed his term of imprisonment, "all of his daughters [would] be above the age of 18." Id. at 239. To be sure, Garcia also has two biological sons currently under the age of eighteen. But Garcia has not shown why the special conditions imposed on him, particularly given the fact that he is not and will not be their custodial parent, are overly restrictive.

Thus, in sum, we conclude that the district court did not abuse its discretion in imposing the sex offender special conditions of supervised release.

*Delegation of sentencing authority to RSA*

In his second issue on appeal, Garcia argues that the district court, "[b]y conditioning [his] supervised release on 'successfully' completing the RSA treatment program," including compliance "with all of RSA's 'rules and restrictions,'" effectively "assigned unlimited control over [his] movements, associations and liberty to a non-judicial, private corporation." Aplt. Br. at 9. This, Garcia argues, amounts to an "unconstitutional delegation of [the district court's] sentencing power." Id.

Garcia concedes that he did not raise this issue below and that, consequently, it is reviewed only for plain error. Id. at 30. "We will find plain error only when there is '(1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" United States v. Wireman, 849 F.3d 956, 962 (10th Cir. 2017) (quoting United States v. Marquez, 833 F.3d 1217, 1221 (10th Cir. 2016)).

"Article III of the United States Constitution confers the authority to impose

punishment on the judiciary, and the judiciary may not delegate that authority to a nonjudicial officer." Bear, 769 F.3d at 1230. "In determining whether a particular delegation violates this restriction, courts distinguish between those delegations that merely task the [nonjudicial] officer with performing ministerial acts or support services related to the punishment imposed and those that allow the officer to decide the nature or extent of the defendant's punishment." United States v. Mike, 632 F.3d 686, 695 (10th Cir. 2011). "Delegations that do the former are permissible, while those that do the latter are not." Id.

Garcia argues that the condition requiring him "to 'successfully complete' sex offender treatment and 'comply with the rules and restrictions specified by the treatment agency' . . . subjects [his] sentence to the discretion of RSA, a private corporation."[5] Aplt. Br. at 32-33. "RSA's discretion regarding its 'treatment' of [him]," Garcia argues, "is effectively limitless" because it "can impose any 'rules and restrictions' on his liberty interests that it chooses, and has done so, placing strict limits on his movement and associations that make it virtually impossible to maintain healthy social connections, improve his employment situation, seek assistance of counsel, or even procure the basic necessities of life." Id. at 33.

We reject Garcia's arguments. To begin with, one of the key reasons that Garcia

---

[5] At the revocation hearing, Garcia's probation officer testified that RSA was, as of that time, the only treatment provider in the Denver metro area that the federal government used for treatment of federal offenders on supervised release. ROA, Vol. 3 at 117.

failed to complete his prior assigned sex offender treatment is that, on numerous occasions, he visited locations without disclosing those activities to RSA or his probation officer and generally engaged in secretive behavior. Garcia is now essentially complaining that RSA's treatment protocol prevents him from engaging in such behavior in the future, i.e., from traveling where he wants and doing what he wants without prior authorization. But nothing in the record indicates that RSA intends to wholly prevent him from visiting any locations. Rather, the record indicates that all Garcia must do is disclose his whereabouts to RSA and generally be open about his activities. We are not persuaded that those requirements amount to allowing RSA to decide the nature or extent of Garcia's punishment.

As for Garcia's assertion that RSA prohibited him from taking a new job, that assertion is belied by the record. Garcia testified during the revocation hearing that he had been offered a higher-paying job and talked to both RSA officials and his probation officer about the possibility of taking it. ROA, Vol. 3 at 174. According to Garcia, "RSA wasn't sure if it was a good idea" because Garcia's then-current employer "liked [him]" and was "flexible with [his] terms." Id. Garcia testified that he then spoke with his probation officer about the situation and the officer expressed concern that the new employer might not be flexible with Garcia's "timeframe having to go see [the probation officer] or RSA." Id. Ultimately, Garcia testified that the situation "was causing [him] so much stress, [he] just had to turn down the job offer." Id. All of which establishes that RSA did not prohibit Garcia from taking the new job, but simply expressed concern about

-23-

whether the new job would be compatible with his successful completion of his sex offender treatment.

We also reject Garcia's assertion that RSA's rules and restrictions prevent him from "seek[ing] assistance of counsel" and "procur[ing] the basic necessities of life." Aplt. Br. at 33. Simply put, there is no evidence in the record to support either assertion.

Garcia also argues that "RSA maintains absolute power to discharge [him] . . . not only for any perceived violations of its rules but for virtually any reason it wants." Id. Indeed, he argues, RSA can discharge him "based on wholly subjective, vague allegations of 'manipulation' or therapeutic psychobabble regarding [his] 'superficial presentation' and insufficient 'internationalization of the tools' of therapy." Id. (quoting ROA, Vol. 2 at 44).

Of course, RSA, as the designated expert in sex offender treatment, retains authority to exercise its professional discretion in treating Garcia. But this retention of authority does not rise to the level of deciding the nature or extent of Garcia's punishment. Moreover, to the extent Garcia believes he may be subjected to arbitrary decisions on the part of RSA, he can surely raise those arguments at a future revocation hearing.

Lastly, Garcia argues that "[b]eing discharged from RSA for any real or imagined treatment failure RSA deems sufficient results in . . . a continuous cycle in which [he] ping-pongs from prison to supervised release then back to prison for treatment 'failures' based on the purely subjective judgment, if not the arbitrary whim, of" RSA. Aplt. Br. at

33-34. The problem with this argument is that it demonstrates Garcia's lack of acceptance of responsibility for his own conduct. Nothing in the record indicates that RSA acted arbitrarily in the past. Rather, the record establishes that it was Garcia's own secretive conduct that resulted in his unsuccessful treatment and, ultimately, his violations of supervised release.

For all of these reasons, we conclude that the district court did not err, let alone commit plain error, in requiring Garcia to "successfully" complete sex offender treatment with RSA.

IV

The government's motion to dismiss the appeal is DENIED and the judgment of the district court is AFFIRMED.

Entered for the Court

Mary Beck Briscoe
Circuit Judge